Catron, Ch. J.
delivered the opinion of the court.
The minor matters presented by the bill and proofs will be first disposed of. 1. The charge of by-bidding is denied by the answer, and not sustained by proof. 2. That Mr Saunders promised that a store should be established by each of the commissioners, is not alleged in the bill, and if alleged, was a loose conversation, entitléd to no weight. 3. There is no proof that the commissioners promised to open the Muscle Shoals; nor that they promised to build a bridge across Shoal Creek; or that they promised to establish a horse boat across Campbell’s Ferry.
This narrows the controversy to the promise on the part of the commissioners, to the making of the canal and roads. On this ground of relief the bill alleges, that to influence purchasers to bid the highest prices for lots, it was held out and stated by the commissioners, that a large and extensive basin, as a harbor for boats, was to be excavated near to said town, at a par *194 ticular place designated; that a canal was to be dug and opened with suitable locks along the northern margin of said town, connecting said basin with the Tennessee river, suitable and convenient for boat nav igation, affording a body of water twenty feet in width, and four feet in depth, which was to be fed by Hawkins’ creek; but should the creek not furnish a supply of water sufficient, the canal was to be fed by a sluice from the river. That roads were to be cut and opened on either side of said river, intersecting the great military road; which was to be done by the commissioners in a short time, and at the company’s expense; that the caiial should be finished in one and two years, and that no collection should be made from purchasers for the lots they might purchase, until the canal should be completed; that these considerations, and many others, were held forth in a public speech by one of the commissioners, before the biddings opened, were urged by the commissioners and their agents, and a high excitement produced on those present; that the lots sold at prices most extravagant, under which influences complainant purchased, and at such extravagant prices. The commissioners admit they promised to make a canal, but deny that they promised to make any locks on it, or a basin, as alleged. They also deny that a canal was to be made in one or two years, or that they promised the payment of the purchase money bid for lots, should not be required until it was completed; but answer, the canal was to be made in a reasonable time, and that the first instalment due for lots sold, was the fund looked to as the means to make the canal. They deny they promised to make roads, save from the town site to Campbell’s ferry.
The proofs established, that the commissioners did promise and undertake, just before the biddings opened, through Turner Saunders, in a public speech delivered by him, that they would make the canal with a basin *195 and locks,d as charged. This was often repeated by Clements, the crier, during the sale, and was urged as a prominent reason why the town would enjoy future advantages. The locality of the canal and basin had been surveyed and marked, and was as well defined and known as the town plat. In the neighborhood of the basin, lots sold higher, because of their nearness, it is also proved, that between the town site and river, (about three fourths of a mile,) the ground was spongy and the road miserable. That the canal was necessary to the growth and prosperity^ of the town, was an admitted fact at the day of sale, and is undoubted from the proof, and that the lots sold much higher by reason of the promise to make it, is clearly proved; that the commissioners promised to complete the canal in one or two years, is not satisfactorily proved. They spoke of two years as sufficient time, and Mr Saunders said it would be completed before any payment would be required from the purchasers, but this was obviously the mere expression of an individual opinion, (in the most perfect sincerity we do not doubt,) that the canal would be completed within the first year, and before the first instalment was due from the purchasers of lots. As to the promise to make roads, we do not think it had any material influence on purchasers; it is not proved that it had, or is it probable. As to the canal, however, the proofs or probability produce a widely different conviction. That the promise was made to produce high prices for lots, and that it was made in the utmost good faith by the commissioners, and its speedy and faithful execution confidently relied upon by the purchasers, is free from doubt. It is also true, that most delusive and extravagant prices were given for lots, and those purchased by complainant among that number; but the principal cause for the delusion is found in the history of the times, and the rage for speculation in land and town lots then prevailing. *196 This common folly is no ground for relief, and must he laid out of the question. Seymour vs. Delaney, 6 John. Ch. C. 223.
In reference to the promise to make the canal, the commissioners, from their deservedly high character for integrity, had accorded to them by the purchasers, the most unbounded confidence at the time of the sale. The certainty that the canal would be constructed in a reasonable time, induced the purchasers of lots to bid prices something like equal to what would have been given, had the canal and basin actually been made at that time. The town site described to the purchasers, was one on the high grounds, a distance from the river; the situation more healthy than if nearer to the river, and connected therewith by a navigable canal and basin, to serve as a harbor. Such the town site was to be made by artificial means, and forthwith by the commissioners, at the expense of the company. In reference to a site thus improved, did the complainants buy the lots. The advantages of the site described, induced much higher prices to be given for lots; and it lay upon the company to make good the description; and if it failed, the purchaser was clearly imposed upon, and has a right to have his contract rescinded upon the ground, that his mind assented to the contract, influenced (and deluded) by the undertakings of the company. 2 Dow, 265. To permit the company to take the benefit of the increased price without making the canal, would be to violate a standing maxim at law and in equity, that no one shall take advantage of his own wrong.
That it would be a wrong to permit the company to retain the money the canal would have cost, and to collect the full price the lots sold for, is admitted; but it is insisted that much money (near $10,000) was expended on the canal before it was abandoned, and that it was not abandoned until it had become apparent that the *197 town would not be settled, and the canal of no sort of use. As to the labor done on the canal, it would have been of no sort of benefit to the town, had it flourished equal to the extravagant anticipations of the purchasers of lots at the time of the sale. The» commissioners in 'their answer deny, that they undertook to make the locks or basin, and thereby admit that they never pretended to comply with their promise. That -a canal from the grounds above the level of the river at a low stage of water, could be made without one lock or more? would be impossible. The commissioners before the sale had surveyed the ground where the canal was promised to be made, had marked it out, and declared it easily and certainly practicable; if they were mistaken, they must abide by the consequences of a false representation, upon the principle, that if A sells B land not known to the purchaser, representing it to have a mine on it, or- other advantages it does not possess, the contract shall be set aside for this representation, although it may have been made through mistake. 5 Johns. C. C. 174, 182, Stout vs. Bales. 2 P. Wms. Rep. 217. 1 Jac. and W. 12, 112. 4 Price’s Rep. 135. 2 Dow’s Rep. 266. 3 Cra. Rep. 281. The parties must be placed as nearly the situation they were in when the sale took place, as maybe; and if the property continued of the same value nominally, they would be so on a mere rescisión of the contract; but it is insisted the lots are at this day ,of no value as town property. This is true; the town plat is of no more value than other lands of equal quality in the neighborhood; yet if the land itself were of the nominal value, any change of price, growing out of any change of times and public opinion, is no sufficient reason why this town company should enforce payment for the town sold, without having made good the description by artificial means, in reference to which the lots were purchased. It is not certain, had the canal and other improvements *198 been made as promised, at an early day, but that the town would have become respectable as others in the neighborhood, and the purchasers suffered but partially. This is probable. The company were bound in equity to make good their description promised, and that in a reasonable time, before neighboring towns on the river acquired the ascendency by the location of capital and population, so as to blight the prospects of purchasers at the Bainbridge site. Some one town near the foot of the Shoals was to be respectable, and the others worth little or nothing. Every means were used, so far as promises of improvements, and high, not to say extravagant praises, of local advantages could be used, to induce purchasers of lots to believe that Bainbridge must be the great town on Tennessee river below the Shoals, to the prostration of its rivals. These praises, aside from promises to improve the site, were matters of opinion, of which the purchasers had the means to judge as well as the commissioners, and are no grounds for relief. But then there was a swampy bottom between the town site and the river, hardly passable with wheels heavily laden, especially in the winter and trading season; which obstacle to the improvement of the town, it was necessary to overcome before the town could commence improving to the extent anticipated. The witnesses say, the commissioners promised in the public speech made by Mr. Saunders, and in private conversation during the bid-dings, that the company would bring the river to the town, “and give it a start;” that they were selling a town in fact on the bank of the river. The commissioners did not make the canal with a basin and locks; the town has not improved; the lots have become worth nothing as town property, and a canal at this day .would be useless to the complainant; but this is no sufficient excuse for the commissioners to resist the bill; their want of good faith conduced to produce the present state of *199 things, and they can take no advantage of their own wrong.
It is insisted, that although the contract was subject to he set aside previously, yet by the renewal of their notes in the fall of 1821, complainants confirmed their contract, regardless of the breach of duty in not constructing the canal and basin, on part of the commissioners. It is true, if the vendee intends to abandon an ex-ecutory contract, he is bound to do so promptly and decidedly, on the discovery of the breach on the part of the vendor; or on discovery of a defect of title, or an imposition in the description of the property sold; and if he negotiate with the vendor afterwards, and partially changes the contract, with full knowledge of the facts upon which the contract is sought to be set aside, he shall be deemed to have abandoned this ground of equity, and is estopped to set it up. 3 John. C. C. 42. Do the facts in this cause warrant the application of this rule? The notes were renewed by the purchasers in 1821, in strict conformity to the act of Congress passed in the spring of that year, for the relief mainly of the complainants as purchasers of public lands. The answers and proofs clearly show that this was the exclusive object, and was intended for the benefit, of both sides; but what is more satisfactory, the canal was then in progress, and the purchasers not having been called on for payment, assented, and were willing a further time should be al- , lowed for its completion. Had it been finished in any reasonable time, say one or even two years, after the notes were renewed, this court would without hesitation dismiss the bills.
It is next insisted, the complainants did not ask to be relieved in time, and therefore the bills must be dismissed.
This depends greatly upon the nature of the contract between the vendors of the town, and the purchasers, and the situation of the respective parties. The com *200 pany dealt with all the purchasers alike. Payment was of course demanded of all at the same time. The conduct of the company, and the purchasers, conformed to this course. The company determined, as appears by the answers, not to enforce payment from the purchasers until the whole instalments were due. During a portion of this time, the canal was in progress; when it was finally abandoned, does not appear. But after it was abandoned, the notes of the purchasers of the lots, were divided among the stockholders of the company, when for the first time payment was demanded of the complainants, and the other purchasers, and then payment was resisted promptly and decidedly by the complainants. Considering the indulgence extended to the commissioners, so that the canal might be completed, and the indulgence extended in turn by the company to the purchasers, because of the change of times mainly no doubt, there is nothing in this ground of defence.
It is next insisted as to Donelson, that he was, and now is, one of the company who sold the lots, and cannot he heard to complain of himself.
He asks for relief in the character of a purchaser, from a contract distinct, and independent of the partnership; as a partner he must suffer the consequences in common with his co-partners, for non-compliance in not constructing the canal; hut as an individual purchaser, he is entitled to the same measure of justice that Haynes, the other complainant is. We therefore order the decrees to he affirmed, and that the complainants surrender their title bonds for the lots into this court, to he cancelled.
Decree affirmed.